# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| LEGGETT & PLATT, INCORPORATED, | ) | |
| A Missouri corporation, LEGGETT & PLATT | ) | |
| (SHANGHAI) CONSULTING CO., LTD., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No.  3:15-cv-05064-MDH |
| | ) | |
| FLEETWOOD INDUSTRIES, INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHARLIE ZHU, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court is Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.  (Doc. No. 3).  The Court held a hearing on Plaintiffs' Motion for Temporary Restraining Order on July 7, 2015.  A later hearing will be scheduled on the Preliminary Injunction at which time the parties may present additional evidence.  After careful review of the briefs and exhibits submitted by the parties and considering the testimony of witnesses and arguments made by counsel, this Court denies Plaintiffs' Motion for Temporary Restraining Order.

## BACKGROUND

Plaintiffs are the current employer of Charlie Zhu.  Zhu is the Operations Manager of Leggett & Platt's Beeline division located in Shanghai, China.  Zhu has been employed by Leggett for approximately 15 years.  As Operations Manager he supervises the two other Beeline

1

employees located in Shanghai.    Zhu oversees quality control and procurement for Beeline's China operations.

On approximately July 14, 2014, Leggett made a public announcement that it sought to sell its Store Fixtures Group, which included Beeline, Zhu's employer.  In order to help facilitate a sale of the Store Fixtures Group, Leggett hired C.W. Downer, an investment banker firm, to help with the sale.  Fleetwood was one of the companies interested in the potential purchase of Leggett's Store Fixtures Group.  As a result of their interest, Leggett, through its agent, C.W. Downer, entered into a non-disclosure agreement ("NDA") with Fleetwood.  (Exhibit 3).  The NDA was signed on September 4, 2014, by Fleetwood's CEO and President and an agent of C.W. Downer.

The NDA contains the following paragraph regarding the solicitation of employees:

You agree, for a period of two~~three~~ years from the date of this Agreement, not to directly or indirectly (through your Representative, professional search firms or otherwise) solicit for employment any employees of the Company, the Business or any of their subsidiaries with whom you have had contact or who was identified to you during the period of your investigation of the Company or the Business without the Company's prior written consent.  The preceding sentence does not, however, prohibit you from making general solicitations for employment or hiring anyone who responds to, ~~by means of~~ general advertisements, public notices, or internal or external websites or job search engines nor directed to target the Company/Business or any of the Company's employees.

The NDA further provides:

You agree that money damages would not be a sufficient remedy for any breach of this Agreement by you or your Representatives and that in addition to all other remedies the Company shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach.

After several discussions, meetings and negotiations, Fleetwood's potential purchase of the Store Fixtures Group went "sideways" and negotiations ended in mid-May 2015.  Beeline's

2

president testified there are two other potential buyers currently in negotiations with Leggett regarding the purchase of the Beeline division.[1]

On or about June 8, 2015, Zhu submitted a letter of resignation (Exhibit 33) announcing to Leggett that he was resigning his employment. Leggett subsequently discovered Zhu had accepted employment with Fleetwood as the head of its China Operations.

On August 6, 2014, prior to the execution of the NDA between Leggett and Fleetwood, Zhu sent an email to Pam Demarest, one of Fleetwood's Vice Presidents, stating: "I heard your company is looking for a person that will be in charge of your Shanghai office. I am quite interested in this role . so please review my CV as following:" (Fleetwood Exhibit 1). Demarest testified Fleetwood had posted a general advertisement on their website, and through LinkedIn, that they were looking to fill this position. Leggett acknowledges it was unaware of this email at the time it filed this lawsuit. (See Plaintiffs' Supplemental Brief in Support of Injunctive Relief, Doc. No. 16).

Zhu, who is presumed to still be in China, did not testify at the hearing, was not represented at the hearing, and has not been served by the Plaintiffs in this lawsuit. He was notified of the hearing through an e-mail sent by Plaintiffs' counsel. Plaintiffs submitted Leggett's Labor Contract with Zhu. The Labor Contract, entered into by Leggett & Platt's Shanghai Consulting Company and Zhu states, in part, "In accordance with the *Labor Contract Law of the People's Republic of China* and regional, provincial and local laws and other related regulations…." It includes a labor dispute clause which includes arbitration rights. (Exhibit 32). And further indicates that "if either Party objects to the arbitration awards, it may institute a

---

[1] There were originally 5 segments to be sold. Three segments were acquired by another company and a fourth segment, China Fixtures, was sold separately. Only one segment – Beeline remains for sale.

proceeding with a competent court in China within 16 days after receipt of such award." The Court's review of this document indicates the labor contract is subject to the jurisdiction of the Chinese courts.

Leggett argues that the Labor Contract's provision stating "Employee shall abide by his/her obligations to Employer pursuant to the Employee Invention and Confidential Information Agreement and the Non-Compete Agreement" provides further restrictions on Zhu's potential employment with Fleetwood and also subjects him to this Court's jurisdiction. However, there is no evidence before the Court Zhu ever signed a document entitled Employee Invention and Confidential Information Agreement and the Non-Compete Agreement or any document subjecting him to this Court's jurisdiction.

Beeline's President testified Zhu's last day of employment is July 10, 2015. Fleetwood's Vice President of Supply testified Zhu is set to begin work for Fleetwood on July 13, 2015, but that Fleetwood does not have a signed employment agreement with Zhu.

## MOTION FOR TEMPORARY RESTRAINING ORDER

The Eighth Circuit has summarized the factors required to determine whether a temporary restraining order should be issued pursuant to Rule 65 of the Federal Rules of Civil Procedure. The factors are set forth in *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109 (8th Cir. 1981) as follows:

> In sum, whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Id.* at 114 (8th Cir. 1981).

The burden of establishing the necessity of a temporary restraining order is on the movant.  See *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).  Further, no single factor is determinative in balancing the equities.  *Dataphase,* 640 F.2d at 113.

### 1.    The threat of irreparable harm to the movant:

Plaintiffs have the burden to establish irreparable harm and the inadequacy of legal remedies.  Plaintiffs first point to the plain language of the NDA in support of their argument. However, while the NDA does contain language indicating "money damages would not be a sufficient remedy" this alone is certainly not enough to establish a finding of irreparable harm. See, e.g., *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004); citing, *Smith, Bucklin & Assocs., Inc. v. Sonntag*, 83 F.3d 476, 481 (D.C.Cir.1996) ("Although there is a contractual provision that states that the company has suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be preliminarily enjoined, this by itself is an insufficient prop."); *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2nd Cir. 1987)("contractual language declaring money damages inadequate in the event of a breach does not control the question of whether preliminary injunctive relief is appropriate"); *Markovits v. Venture Info Capital, Inc*., 129 F.Supp.2d 647, 661 (S.D.N.Y.2001) (provision in contract providing that breach would cause irreparable damage is merely one factor to be examined in making irreparable harm determination); *Dice v. Clinicorp, Inc.*, 887 F.Supp. 803, 810 (W.D. PA 1995)(contractual provision cannot act as substitute for finding by court regarding injunctive relief); *Firemen's Ins. Co. of Newark v. Keating*, 753 F.Supp. 1146, 1154 (S.D.N.Y.1990) ("it is clear that the parties to a contract cannot, by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate").

Plaintiffs argue that if Zhu is not enjoined from starting work at Fleetwood, Leggett will suffer irreparable harm. Leggett argues "potential purchasers of Beeline have learned of Zhu's departure"' and that if Zhu is allowed to work for Fleetwood it may potentially reduce the purchase price for Beeline. During the hearing the Court heard testimony that there are currently 2 potential buyers in negotiations with Leggett for the purchase of Beeline. One of those purchasers has learned about Zhu's departure and has allegedly stated they may reduce their purchase price by $1 million. Apparently at this time the other purchaser does not have this knowledge. The total purchase price, and as a result the significance of the alleged reduction in price, was not specifically disclosed to the Court.

The Court is not convinced at this point that an award of money damages, if Plaintiffs were to ultimately prevail, is an inadequate remedy under the unique circumstances of this case. The Court believes from the evidence that Zhu is a talented and valuable mid-management employee. However, as set forth above, at least one potential buyer has suggested a one million dollar reduction in purchase price based upon Zhu's departure. That would seem to indicate that if Plaintiffs prevail, an appropriate measure of damages would be any reduction in the sales price for Beeline that Plaintiffs can attribute directly to Zhu's departure.

On the other hand, the evidence indicated Zhu has not yet signed a formal employment contract with Fleetwood and that his pay package at Fleetwood was roughly the same as it has been with Leggett, which was $75,000, plus benefits and perhaps bonuses. If Leggett is truly facing irreparable harm, or even a million dollar price reduction, the free market provides Leggett with an opportunity to compete for Zhu's continued services. The latter opportunity may have been lost when Leggett chose to sue Zhu in the United States, rather than negotiate new

terms of his employment in China. However, to his credit, the evidence indicates Zhu continues

to give Beeline his best efforts and maintains a good relationship with Beeline management.

**2. The state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant:**

Leggett argues injunctive relief is necessary to preserve the status quo.  Leggett argues

Fleetwood had access to "confidential" information regarding Zhu's employment, including his

salary and benefits, pursuant to the NDA.  However, the evidence before the Court also reflects

that Zhu contacted Fleetwood via email prior to the execution of the NDA.  There was no

evidence of any solicitation by Fleetwood of Zhu.  Further, even if Fleetwood had access to

Zhu's employee information, including his employment agreement, salary and job duties, that is

information Fleetwood could have (and Fleetwood claims it did)  obtain directly from Zhu after

he had contacted Fleetwood and inquired about the position as posted on LinkedIn and

Fleetwood's webpage.    Further, Leggett did not provide any evidence to the Court during the

hearing regarding any other information or documents that Fleetwood allegedly obtained

pursuant to the NDA that Fleetwood now has in violation of the NDA or that Fleetwood has

allegedly misused to necessitate entry of a TRO.

**3.  The probability that movant will succeed on the merits:**

The NDA prohibits Fleetwood from certain solicitations of Leggett employees for two

years after its effective date September 4, 2014.  It does not, however, prohibit Fleetwood from

employing Leggett employees. The only evidence presented by Leggett concerning the

circumstances surrounding how Zhu came to be employed by Fleetwood was provided through

Beeline's President and Demarest.  Beeline's President testified in June 2015 after he received

Zhu's letter of resignation, Zhu told him he had conversations with unnamed employees of

Fleetwood sometime last year (2014) and that Zhu was told Fleetwood would have a job for

7

someone with his talents. Zhu told Beeline's President he was nervous about his job based on Leggett's decision to sell Beeline, which was publically announced on July 14, 2014. The timing of Zhu's email to Fleetwood, August 6, 2014, is consistent with his acting on such concern. The Court received this testimony under an offer of proof. The Court hereby rules the evidence of Zhu's statements to Beeline's President are admissible as against Zhu, but not against Fleetwood.

Notwithstanding admissibility issues concerning this hearsay evidence, the testimony falls short of showing any solicitation of Zhu by Fleetwood after the effective date of the September 4, 2014 agreement. Demarest testified it was her understanding that Zhu contacted Fleetwood in response to a notice on the internet. On August 6, 2014, Zhu sent an email to Fleetwood seeking employment. She testified later emails were sent by Zhu discussing salary demands although these were not offered into evidence. She testified Zhu was the second choice for the job advertised and that it took several months for the company to conclude the first choice was not going to work out. She further testified Zhu stayed in touch with Fleetwood and periodically inquired regarding the status of his application. Obviously, if Fleetwood was going to buy Beeline the urgency of further consideration of Zhu's August 6, 2014 inquiry by Fleetwood was diminished. This evidence falls short of showing any solicitation of Zhu by Fleetwood after the effective date of the agreement. It shows instead that Zhu consistently followed up with Fleetwood regarding his August 6, 2014 email, potentially sent out of concern for Leggett's decision to sell Beeline and in response to a general job posting on Fleetwood's web page.

Even setting aside the issue of whether solicitation occurred, the plain language of the NDA indicates, "the preceding sentence [the prohibition on employee solicitation] does not, however, prohibit you from making general solicitations for employment, or hiring anyone who

responds to, general advertisements, public notices, or internal or external websites or job search engines not directed to target the Company/Business of any of the Company's employees." Based on the evidence before the Court at this time, Zhu's contact with Fleetwood falls under this exact language which, without the benefit of further evidence, indicates a lack of probability of success on the merits.

The Court is somewhat handicapped in reaching its decision at this time based on evidence at this expedited hearing because it is ruling without the benefit of testimony from Zhu, the most important witness to these events. The court also rules without the benefit of evidence from those who actually negotiated the redline changes to the NDA. It is unclear if the parties to the agreement exchanged written or oral communications regarding the basis for the requested changes and whether multiple drafts of the agreement were exchanged. The reasons for the requested changes and the process by which they were approved are not clear from the record. Those knowledgeable on these issues did not testify.

Leggett might be correct that the changes were requested by Fleetwood solely with Zhu in mind. It may also be true that industry tradition and even ethical business practices would dictate Zhu be specifically "carved out" from the non-solicitation provision by Fleetwood given his August 6 contact. Neither careful strategic negotiations, tradition, nor business ethics however, provide a legal basis for this court to act given the specific negotiated terms of the agreement.

Without question, in this instance, the due diligence procedures and data room access gave Fleetwood significant insight into Beeline's operations. While those insights have the potential to make Zhu's change of employment more painful to Leggett and more beneficial to

9

Fleetwood, they do not alter the legal impact or interpretation of the non-solicitation provisions of the NDA.

At this time, Zhu has not been served and is not yet a party and the court can afford no relief against him. In any event, the evidence presented at the TRO hearing would have been inadequate to support a restraining order against Zhu. On the evidence presented, it is not clear Leggett would be likely to prevail. As set forth herein, his employment contract expressly provides for a dispute process that ends up in the courts of China rather than the United States and there is no evidence that Zhu ever signed a non-compete agreement even if it would be enforceable under Chinese law. The Court is reluctant to enter a TRO against Zhu without a better basis for jurisdiction over him.

### 4. Public interest:

Here, the parties presented little evidence regarding any public interest at issue with regard to the issuance of a TRO in this case. The public interest represented is in enforcement of the proper interpretation of the parties' contract. The Court has interpreted the NDA according to its plain terms in light of the evidence presented. However, as the Court has already noted, it has concerns regarding its jurisdiction over one of the named defendants, Zhu. While that issue has not been fully briefed or litigated, and Zhu has not yet been served, the Court finds a public concern exists with regard to Plaintiffs' request to essentially enforce a "non-compete" that has not been signed by the employee, Zhu. And further, against an individual that may not even be subject to the jurisdiction of this Court.

Finally, at the hearing on the motion for TRO there was no evidence presented with regard to customer information, confidential and proprietary pricing information or the supply chain that established a need for entry of injunctive relief at this time.

10

Plaintiffs have simply not established the elements necessary for the issuance of a TRO. The Court will hear further evidence on Plaintiffs' request for injunctive relief, if any, at a potential preliminary injunction hearing, or trial on Plaintiffs' claim, however, the Court does not find irreparable harm will occur prior to that time.

## DISCOVERY OF EMAILS

During the hearing, Plaintiffs' corporate representative testified regarding email(s) discussing the potential sale of Beeline and the impact Zhu's departure may have on the purchase price. Fleetwood requested to see a copy of that email which Leggett maintained contains confidential information. After a review of the email provided by Plaintiffs, the Court does not order that the email be produced as evidence, or an exhibit, for purposes of the TRO proceeding. However, at the same time, this ruling has no effect on the discovery of this email, or any other emails, documents or communications, which may ultimately be subject to discovery as part of the ongoing litigation of this matter.

## CONCLUSION

Accordingly, for the reasons stated herein, Plaintiffs' Motion for Temporary Restraining Order (Doc. No. 3) is **DENIED.**


**IT IS SO ORDERED.**

Date: July 9, 2015


_/s/ Douglas Harpool_____
Douglas Harpool
United States District Judge


11